**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LAMAR BROWN,** | : | |
| **Plaintiffs** | : | **CIVIL ACTION NO. 3:19-0374** |
| **v.** | : | **(JUDGE MANNION)** |
| **COURTNEY BARONNER, et al.,** | : | |
| **Defendants** | : | |

<u>**MEMORANDUM**</u>

## I. <u>Background</u>

On January 7, 2019, Plaintiff, Lamar Brown, an inmate confined in the State Correctional Institution, Houtzdale, Pennsylvania, filed the above captioned *pro se* civil rights action pursuant to 42 U.S.C. §1983, in the Court of Common Pleas of Centre County. (Doc. 1). By Notice of Removal dated March 4, 2019, the Defendants removed the above captioned action to the United States District Court for the Middle District of Pennsylvania. <u>Id</u>.

Plaintiff complains of events which occurred at his prior place of confinement, SCI-Benner Township. <u>Id</u>. The named Defendants are the following SCI-Benner Township employees: Superintendent Tammy Ferguson; Psychological Services Specialists Baronner and Hall;

1

Correctional Officers Christopher Franks and William Gerber, and Deputy Superintendents Bobbi Jo Salamon and Daniel Myers. Id.

Plaintiff alleges that on August 7, 2017, during the morning shift, he told Defendant PSS Baronner that he was "having thoughts of self-harm." Id. Defendant Baronner "called Defendant Lt. Franks on the walkie talkie" and "shortly thereafter Defendant Lt. Franks came to Plaintiff's cell to talk to him." Id. Plaintiff told "Defendant Lt. Franks that he was going to harm himself, Defendant Lt. Franks asked Plaintiff what he could do for him," and that "he does not think he's trained to deal with Plaintiff's mental health issues". Id. Plaintiff requested to speak to a psychologist. Id. Defendant Franks "stated to Plaintiff that Defendant PSS Baronner left so [he was] going to call to see if [he] can get a psych down to see [Plaintiff]." Id. Later on Defendant Franks "asked Plaintiff is he wanted to come out to talk to Defendant PSS Hall, Plaintiff replied yes he did want to talk to Defendant PSS Hall." Id. When Defendant Sgt. Gerber approached Plaintiff's cell door to take him to see Defendant Hall, Plaintiff stated that he "would like to speak to Defendant PSS Hall at his cell door." Id. Plaintiff claims that "a few minutes later Defendant PSS Baronner came to Plaintiff's cell door to talk to him." Id. Plaintiff "explained that he was being encouraged to hurt

2

himself" and Defendant Baronner asked Plaintiff "[w]hat's your plan[]" and Plaintiff replied, "I'm not sure but they may have to come in here and get me to try to stop me." Id. Defendant Baronner replied that "she was to have him pulled out of his cell for a one-on-one (this is a talking therapy session in private confidential area)." Id.

When Defendant Lt. Franks came back onto the unit, "Plaintiff called him to his cell door and told him again that he wanted to harm himself." Id. Lt. Franks stated, "I talked to Baronner, I'm going to have you brought out to talk to her." Id. At 2:00 pm, Defendant Lt. Franks came back unto the unit and "told Plaintiff that Defendant PSS Baronner stated '[a]fter her first group is set bring [Plaintiff] out to the strip care area to talk to her." Id. Plaintiff contends that "even though [he] had been requesting to speak to someone from mental health since the early hours of the 6:00 am – 2:00 pm shift and was told by Defendant Lt. Franks and Defendant PSS Baronner that he would be brought out to see Defendant PSS Baronner, Plaintiff was never brought out to see Defendant PSS Baronner during that shift."

At approximately 2:30 pm, while Plaintiff was in the shower, Plaintiff claims that he told "officers Mykut and Detwiler that he was having thoughts of self-harm and that he told Defendant PSS Baronner and

3

Defendant Lt. Franks repeatedly on first shift about these thoughts of self-harm and Defendant PSS Baronner and Defendant Lt. Franks told Plaintiff that Defendant PSS would bring Plaintiff out of his cell to speak to him about these issues, but never did." Id. Plaintiff claims that "Correctional Officer Detwiller stated to Plaintiff 'let me go talk to her' (meaning Defendant PSS Baronner)." Id. When Officer Detwiller came back he "told Plaintiff that Defendant PSS Baronner stated, 'I forgot, and Defendant Lt. Franks said that he was going to bring him out." Id.

Plaintiff claims that he again told PSS Baronner at approximately 3:40 pm, that he was "having thought of self-harm" and "Defendant PSS Baronner ignored Plaintiff." Id.

On August 8, 2017, "when Defendant PSS Baronner was making her daily rounds on the unit, when [she] came to Plaintiff's cell door, Plaintiff swallowed approximately 25 pills in front of her then covered [his] cell door window and swallowed about 10-15 more pills." Id. After this incident, Plaintiff was "taken to the Psychiatric Observation Cell ("POC")" and "was dressed in a suicide smock and placed into a cell that had a camera mounted on the wall" and he "vomited profusely (sic) for hours." Id.

4

Brown claims that his ingestion of the pills was a suicide attempt, and that prison staff were deliberately indifferent to his serious medical needs by failing to place him in a POC on August 7. Id.

Prior to the August incident, Plaintiff had an incident on May 22, 2017. (Doc. 1 at 12, Initial Review Response). The incident is summarized in the Initial Review Response to Plaintiff's Grievance No. 681518 as follows:

> I am in receipt of your Official Inmate Grievance dated 6/8/17 in which you claim that you had a mental health crisis in your cell on 5/22/17. You report that Lt. Franks and PSS Eaton were two cells away from you and were talking with another inmate. You assert that Lt. Franks did come talk to you but that you "blanked out" and punched the cell door, injuring your hand and causing bleeding. You report that you told Lt. Franks that you were having thoughts of hurting someone or breaking something, including yourself. You claim that PSS Eaton was well aware that you were having a crisis, but she never came to speak to you. You also report that you were not taken to a POC cell, which you claim is mandatory. You report that on the second shift you punched your cell window, causing it to break, and injuring you hand even more. Lastly, you claim that you should have been taken to the POC on first shift and that PSS Eaton was deliberately indifferent to your mental health issues. As relief, you seek compensatory damages and appropriate action.
>
> I have investigated your claims and found that PSS Eaton did meet with another inmate four cells away from you on the date in question and was accompanied by Lt. Franks. It was noted that upon their entrance into the DTU, you began to yell obscenities at PSS Eaton, to include calling her a "fucking bitch," "whore," and "worthless." Due to your behavior, she was unable to interact with the inmate that she was attempting to

5

speak to. At her request, Lt. Franks did come talk to you so that she could address the crisis on hand. At no time did PSS Eaton hear you call out that you were having thoughts of self-harm or that of harming others. Additionally, PSS Eaton was not informed that you requested to speak with her, Lt. Franks did not indicate that you needed to be seen, and PSS Eaton did not hear any noise coming from your cell area that would indicate that you had punched anything. In terms of POC placement, orders for such are at the discretion of the facility psychiatrist. As PSS Eaton was not aware of any immediate mental health concerns, she would not have contacted the psychiatrist for POC orders. Additionally, it is not a "requirement" that inmates be placed into a POC if/when they verbalize thoughts of harming self or others.

In light of this information, your Official Inmate Grievance is denied. I have found no grounds to support that PSS Eaton was deliberately indifferent to your concerns. You will not be granted compensatory damages or any other action.

(Doc. 1-2 at 12, Initial Review Response).

Thus, Brown filed the instant action, seeking compensatory and punitive damages, alleging Eighth Amendment violations of deliberate indifference to his attempted suicide against all named Defendants. Id. Specifically, he claims that "Defendants Baronner, Franks, Gerber and Hall ignoring Plaintiff's verbalizations that he as having thoughts of self-harm and Plaintiff subsequently harming himself as a result of them refusing to take action constitutes deliberate indifference to Plaintiff's medical/mental health needs in violation of the Eighth Amendment." Id. Additionally,

6

Plaintiff claims that Defendant Salamon, Myers and Ferguson "had the power to make some type of correction action" through the grievance process, but failed to act and "allowed psychology staff to treat these harmful situations in a lackadaisical and indifferent manner." Id.

Presently before the Court is Defendants' motion for summary judgment. (Doc. 13). The motion is fully briefed and is ripe for disposition. For the reasons set forth below, this Court will grant Defendants' motion for summary judgment, in part and deny the motion, in part.


## II. **Summary Judgment**

Federal Rule of Civil Procedure 56(a) requires the court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. Id. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 257; Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am., 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consol. Rail Corp., 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Electric Co., 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56 of identifying evidence which demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56 to go beyond his pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue.

8

Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986). When Rule 56 shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323. See Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992).

In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. White, 826 F.2d at 59. In doing so, the Court must accept the nonmovant's allegations as true and resolve any conflicts in his favor. Id. (citations omitted). However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be

tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." L.R. 56.1. A party cannot evade these litigation responsibilities in this regard simply by citing the fact that he is a *pro se* litigant. These rules apply with equal force to all parties. See Sanders v. Beard, No. 09-CV-1384, 2010 WL 2853261, at *5 (M.D. Pa. July 20, 2010) (*pro se* parties "are not excused from complying with court orders and the local rules of court"); Thomas v. Norris, No. 02-CV-01854, 2006 WL 2590488, at *4 (M.D. Pa. Sept. 8, 2006) (*pro se* parties must follow the Federal Rules of Civil Procedure).

## III.   Statement of Undisputed Facts

In 2002, Brown was convicted of robbery with a deadly weapon and was sentenced to a term of incarceration of 15 to 30 years. (Doc. 15-1 at 28, Brown Deposition).

At all relevant times, Brown was under the care of mental health professionals at SCI-Benner Township. (Doc. 16 at 3, Baronner Declaration). Brown was housed in the Diversionary Treatment Unit ("DTU") at SCI-Benner Township during August 2017. Id. The DTU is for

10

inmates who have mental health needs and also require high security housing. Id. An inmate housed in the DTU has a weekly review with the Program Review Committee ("PRC"). Id. The psychology staff conduct rounds and make contact with each inmate on the DTU every weekday. Id.

In or around the first week of August 2017, Brown was restricted from attending out of cell mental health programming because Brown was verbally abusive and assaultive to staff during an escort. Id. Because Brown was placed on restriction, Brown missed multiple group therapy sessions during the first week of August 2017. Id.

On August 7, 2017, Baronner saw Brown at his cell due to Brown's request. Id. Baronner declares that Brown stated: "I want to go to the POC send those guys in here to get me." Id. A POC is a Psychiatric Observation Cell. Id. Baronner explained to Brown that no one would come into his cell to get him and assessed Brown's suicidality. Id. Brown did not report a plan or any self-injurious intentions. Id. He reported feeling homicidal and wanting to harm someone. Id. Brown reported frustrations over not being allowed to go to out-of-cell programming because he was placed on group restriction. Id. Baronner attempted to process the situation with Brown that led to the restriction, but he talked over her and was not receptive. Id. She

11

discussed Brown taking responsibility for his actions and learning to cope with symptoms on his own. Id. Brown reported that he wanted staff to come to his cell and get him and that he was going back to the "old Brown." Id. Baronner discussed decision making with Brown and informed him he could choose to be "old Brown" or work on bettering himself. Id.

Baronner determined that Brown should not be placed in a POC on August 7, 2017 based on her best clinical judgment at the time because she did not believe that Brown was at immediate risk of suicide or self-harm. Id.

Brown testified at his deposition that the following events occurred:

a. "[D]uring first shift in the morning" on August 7, 2017, "I told PSS Baronner that I was having thoughts of self-harm." (Doc. 15-1, Brown Deposition).

b. "[S]he called Lieutenant Franks on the walkie-talkie. Shortly thereafter, Lieutenant Franks came to my cell to talk to me. I told him I was going to harm myself. He asked me what he could do for me. I told him, I don't think you're trained to deal with my mental health issues. I need to speak to a psych. Franks said Baronner left, so I'm going to call to see if I can [get] a psych down here." Id.

c. "Later on Lieutenant Franks asked me if I wanted to come out to talk to psych Mr. Hall." Id. "When Sergeant Gerber came to get me" to see Mr. Hall, "I told him I wanted to talk to Mr. Hall at my [cell] door." Id.

12

d. "A few minutes later, Ms. Baronner come [sic] to my door to talk to me. This is the second time she comes back to my door." Id. "I told her I was being encouraged to hurt myself." Id. "[Baronner] asked me what my plan was. I said I wasn't sure, but [prison staff] may have to come in here and get me to try to stop me." Id.

e. The next day on August 8, 2017, Baronner visited Brown at his cell "during her rounds." At that time Brown "swallowed about 24 pills in front of her." Brown then covered up the window to his cell "and swallowed about 10 or 15 more pills."

Id.

After he took the pills, Brown was taken to medical. (See Doc. 16-3, Medical Records). Plaintiff reported to medical that he took "40-50 white pills" and that "he was told to take all of the pills by 'them upstairs'". Id. He reported that he was "not suicidal." Id. It was noted that Brown was "somewhat disoriented" with an "altered thought process." Id. It was noted that medical was to "continue to monitor" Plaintiff. Id. On August 10, 2017, it was noted that Brown had ingested "35 600 mg tabs of Motrin" on August 8, 2017 and that he was "asymptomatic until today when he complained of burning of stomach after eating lunch." Id. Plaintiff was prescribed Mylanta, and his Prilosec was increased for five days. Id. He was also ordered to follow up tomorrow and  bloodwork was ordered for the following morning. Id. Also on August 10, 2017, Plaintiff was discharged from the POC per Dr.

13

Xue and was to "remain on D roster." Id. It was noted that "an email was sent to PRC awaiting direction." On August 11, 2017, Plaintiff was again seen in medical. Id. He reported "nausea and constipation since occurrence." Id. He was "ambulating" and "oriented." Id. He was prescribed Colace and Miralax. Id. He was directed to follow up as needed. Id.

## IV.   Discussion

### A.   Eighth Amendment Deliberate Indifference to Plaintiff's Attempted Suicide

To state an Eighth Amendment claim based on deliberate indifference to the risk of suicide or self-harm, the plaintiff must allege facts supporting plausible inferences that (1) that the individual had a particular vulnerability to suicide, meaning that there was a "strong likelihood, rather than a mere possibility," that a suicide would be attempted; (2) that the prison official knew or should have known of the individual's particular vulnerability; and (3) that the official acted with reckless or deliberate indifference, meaning something beyond mere negligence, to the individual's particular vulnerability. Palakovic v. Wetzel, 854 F.3d 209, 223–24 (3d Cir. 2017); see also Colburn v. Upper Darby Twnshp., 838 F.2d 663

(3d Cir. 1988) (Colburn I), Colburn v. Upper Darby Twnshp. 946 F.2d 1017 (3d Cir. 1991) (Colburn II); and Woloszyn v. County of Lawrence, 396 F.3d 314 (3d Cir. 2005). See also Easley v. Reuberg, 2021 WL 3639734, at *4 (W.D. Pa. July 30, 2021), report and recommendation adopted, 2021 WL 3634813 (W.D. Pa. Aug. 17, 2021) (citation omitted). The "particular vulnerability" standard does not entail a heightened pleading requirement or a showing that "the plaintiff's suicide was temporally imminent or somehow clinically inevitable." Palakovic, 854 F.3d at 230. However, the vulnerability "must be so obvious that a lay person would easily recognize the necessity for preventative action." Id. at 222. (quoting Colburn II, 946 F.2d at 1025). With presence of such risk, the second element requires the plaintiff to either show subjective knowledge of the vulnerability or that the official should have known that the detainee was particularly vulnerable. Colburn II, 946 F.2d at 1024-25. "Should have known," in this context, goes beyond knowledge with ordinary prudence, or negligence, but is less than subjective appreciation of the risk. Colburn II, 946 F.2d at 1025 (explaining that a defendant's failure to recognize large prominent scars on a decedent's wrists, elbows, and neck as indicative of suicidal tendencies amounted only to negligence precluding liability) (citing Freedman v. City

15

of Allentown, 853 F.2d 1111, 1116 (3d Cir. 1988)). Deliberate or reckless indifference is a willingness to ignore a foreseeable danger to the detainee's vulnerability, or conscience-shocking behavior in unhurried situations. Kedra v. Schroeter, 876 F.3d 424, 446 (3d Cir. 2017) (quoting Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 910 (3d Cir. 1997); Vargas v. City of Phila., 783 F.3d 962, 973 (3d Cir. 2015)).

In support of their motion for summary judgment, Defendants rely on the following facts as undisputed: (i) at all relevant times Brown was housed in the DTU and was visited at least once every weekday by a mental health professional; (ii) Brown never communicated an intent or plan to commit suicide; (iii) Brown never communicated a plan to commit self-harm; (iv) Brown was given the opportunity to meet with PSS Hall on August 7, 2017, but Brown refused to leave his cell to meet with Hall; (v) "a few minutes later" on August 7, 2017, PSS Baronner met with Brown individually at his cell; (vi) PSS Baronner determined based on her best clinical judgment that Brown should not be placed in a POC; and (vii) PSS Baronner returned on August 8, 2017 to meet with Brown again, at which time Brown consumed pills in front of Baronner and Brown was then taken to medical. (Doc. 14 at 10).

16

During his deposition, Plaintiff states that he is on psychotropic drugs due to his "struggle with mental health issues…[o]ne being, allegedly schizophrenia" and "[s]o reality can become meshed with other things at times and that might play a part" when he "can't control it" and he doesn't "know when it might happen or not" and "don't know the outcome." (Doc. 15-1 at 5). He states that "in the past, any time [he had] suicidal thoughts, they automatically [took him] to the POC" and "they do that for every other guy," but "that day, she (Defendant Baronner) said no" so, "that was—that happened, yes." (Doc. 15-1 at 8). Plaintiff indicated that on August 7, 2017 he "told her I want to kill myself[,] I'm going to harm myself," meaning "self-harm, hurt myself, kill myself[,] [t]hey all mean harming oneself." (Doc. 15-1 at 9).

Plaintiff claims that when Lt. Franks told him that Baronner had "left" and if he wanted to talk to PSS Hall, Plaintiff stated that "yes," he "wanted to talk to Mr. Hall at [his] door." (Doc. 15-1 at 17). Plaintiff claims that "a few minutes later Ms. Baronner came to [his] cell door to talk to [him]" and he "told her [he] was being encouraged to hurt [him]self," and that "she knows that because [he's] dealt with her for numerous months" and "she was [his] psych, so she knows what mental health issues [he] struggle[s] with." Id.

17

He claims that when he told her he was "being encouraged," she "never asked what did you mean." Id. She just said, "what is your plan." Id. Plaintiff never told her about the voices in his head "because, she didn't ask." Id. Plaintiff claims that Baronner told him she was going to have him pulled out of his cell for "a one-on-one" and then "she left to go run a group." (Doc. 15-1 at 18). He claims that at that point he "felt hopeless," and "abandoned…like she was encouraging me to do it." Id. He felt like "she didn't' care" and that she was "indifferent to [his] situation[,] to which she knows [he] go[es] through" and he "just felt like a big – big sense of carelessness of her part." Id.

Plaintiff states that he had been hearing voices in his head all day, telling him to hurt himself. (Doc. 15-1 at 19). He claims he never verbalized this because "no one ever came back to get [him]." Id. And that, at shower time, when he explained this to Correctional Officers Detwiller and Mykut, they "let [him] hang out in the shower because [they] want[ed] [him] to have somewhere where [they] can see [him]", claiming that they "we're going to do everything that [they] can being as though the physch's (sic) not coming to see you." (Doc. 15-1 at 22). Plaintiff claims that he was in the shower area for a long time and that when Defendant Baronner "finally came back

on the pod" and he tried to "yell out to her, like, you know, Ms. Baronner, you, I've been trying all day to you know – I've been letting you know what's going on with me here" and "she kept walking to see whoever she went to see" and "[t]hen she left back off the pod and ignored me." (Doc. 15-1 at 22).

Plaintiff states that on August 8, 2017, he had been hearing voices in his head "from the previous day [and] all night" and the voices in his head "told [him] to take the pills. (Doc. 15-1 at 22). He claims that he couldn't explain what was happening to him because "no one ever asked me to, so I could've explained this to them." (Doc. 15-1 at 23).

Here, the totality of the facts presented shows that Brown struggled with mental health issues, for which he was medicated, and that he had past suicide attempts, and had feelings of unverbalized hopelessness on August 7 and 8, 2017. Thus, viewing the facts in the light most favorable to Plaintiff, the Court concludes that there exist genuine disputes of material fact regarding whether Defendant Baronner knew that Plaintiff had a particular vulnerability to suicide and acted with reckless indifference to such vulnerability. See Palakovic, 854 F.3d at 222; Colburn, 946 F.2d at

1023. As such, the Court will deny summary judgment as to Plaintiff's suicide claim as it relates to Defendant Baronner.

As to Defendant PSS Hall, there is no record evidence that this Defendant had any interaction, whatsoever, with Brown on August 7 or August 8, 2017. In fact, Plaintiff's Cumulative Adjustment Records from July 26, 2017 through August 14, 2017, indicates that he had never been treated by Defendant PSS Hall. (Doc. 16-2, Inmate Cumulative Adjustment Records). Accordingly, Defendant PSS Hall is entitled to summary judgment as a matter of law for lack of personal involvement. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1998) (holding that individual liability will be imposed under Section 1983 only if the state actor played an "affirmative part" in the alleged misconduct).

As to Defendant Corrections Officers Franks and Gerber, the Court finds that non-physicians cannot "be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993). Accordingly, Defendant Franks and Gerber are entitled to judgment as a matter of law.

### B. **Personal Involvement**

20

Defendants maintain that the remaining Defendants are entitled to judgment in their favor because of their lack of personal involvement in any constitutional wrongs.  (Doc. 14 at 18).

Under §1983, individual liability may be imposed only if the state actor played an "affirmative part" in the alleged misconduct. Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1998)). Liability "cannot be predicated solely on the operation of *respondeat superior*." Id. In other words, defendants "must have personal involvement in the alleged wrongs . . . shown through allegations of personal direction or of actual knowledge and acquiescence." Atkinson v. Taylor, 316 F.3d 257, 271 (3d Cir. 2003); Rode, 845 F.2d at 120-08.  Moreover, the filing of a grievance, participation in "after-the-fact" review of a grievance, or dissatisfaction with the response to an inmate's grievance, does not establish the involvement of officials and administrators in any underlying constitutional deprivation. See Pressley v. Beard, 266 F. App'x 216, 218 (3d Cir. 2008) ("The District Court properly dismissed these defendants and any additional defendants who were sued based on their failure to take corrective action when grievances or investigations were referred to them."); Brooks v. Beard, 167 F. App'x 923,

925 (3d Cir. 2006) (holding that allegations that prison officials responded inappropriately to inmate's later-filed grievances do not establish the involvement of those officials and administrators in the underlying constitutional deprivation); Ramos v. Pa. Dep't of Corr., No. 06-1444, 2006 WL 2129148, at *3 (M.D. Pa. July 27, 2006) ("[C]ontentions that certain correctional officials violated an inmate's constitutional rights by failing to follow proper procedure or take corrective action following his submission of an institutional grievance are generally without merit."); Wilson v. Horn, 971 F. Supp. 943, 947 (E.D. Pa. 1997) (noting that a complaint alleging that prison officials failed to respond to the inmate-plaintiff's grievance does not state a constitutional claim), aff'd, 142 F.3d 430 (3d Cir. 1998); see also Rode, 845 F.2d at 1207 (concluding that where a defendant, after being informed of the violation through the filing of grievances, reports, or appeals, failed to take action to remedy the alleged wrong is not enough to show that the defendant had the necessary personal involvement); Ayers v. Coughlin, 780 F.2d 205, 210 (2d Cir. 1985) (concluding that a mere "linkage in the prison chain of command" is not sufficient to demonstrate personal involvement for purposes of a civil rights action).

With respect to supervisory liability, there are two theories: "one under which supervisors can be liable if they established and maintained a policy, practice or custom which directly caused the constitutional harm, and another under which they can be liable if they participated in violating plaintiff's rights, directed others to violate them, or, as the persons in charge, had knowledge of and acquiesced in their subordinates' violations." Santiago v. Warminster Twp., 629 F.3d 121, 129 n.5 (3d Cir. 2010 (quotation and alteration marks omitted). As to the second theory, a plaintiff must show that each defendant personally participated in the alleged constitutional violation or approved of it. See C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 173 (3d Cir. 2005); see also Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009). With respect to the first, "the plaintiff must establish that: (1) existing policy or practice creates an unreasonable risk of constitutional injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice." Merring v. City of Carbondale, 558 F. Supp. 2d 540, 547 (M.D. Pa. 2008) (citing Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989)).

23

The record reflects that Defendants Salamon, Ferguson and Myers reviewed and denied Plaintiff's first-level appeals of his grievances. While the review of grievances will not establish personal involvement in an underlying violation, several courts have concluded that a supervisory official may be held liable stemming from the review of a grievance alleging an ongoing violation because the official "is personally involved in that violation because he is confronted with a situation he can remedy directly." See Mayo v. Oppman, No. CV 17-311, 2018 WL 1833348, at *4 (W.D. Pa. Jan. 23, 2018), Report and Recommendation adopted, 2018 WL 943528 (W.D. Pa. Feb. 20, 2018); Gibbs v. Univ. Corr. Healthcare, No. CV 14-7138 (MAS) (LHG), 2016 WL 6595916, at *2 (D.N.J. Nov. 7, 2016); Whitehead v. Rozum, No. 11-102, 2012 WL 4378193, at *2 (W.D. Pa. Aug. 7, 2012).

In the instant case, there is no record evidence before the Court that Plaintiff presented any grievances intended to correct ongoing alleged violations. To the extent that Plaintiff takes issue with Defendant Salamon denying Plaintiff's June 8, 2017 grievance directed at his May 22, 2017 "mental health crisis," in which Salamon stated that "it is not a 'requirement that inmates be placed in a POC if/when they verbalize thoughts of harming self or others," Salamon's response was an accurate statement of policy

24

set forth in Policy Number 13.08.01, Access to Mental Health Care Procedures Manual. (See Doc. 16-1, Policy Number 13.8.1). Thus, Plaintiff's claim that Defendant Salamon's statement in Plaintiff's appeal denial somehow "create[d] dangerous situations for the ones that are under their care," is completely without merit.

## V. **Conclusion**

For the reasons set forth above, Defendants' motion for summary judgment will be granted, in part and denied, in part. The Court will deny Defendants' motion for summary judgment as to Plaintiff's Eighth Amendment deliberate indifference claim against Defendant Baronner. The remainder of Defendants' motion for summary judgment will be granted.

A separate Order shall issue.

*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: March 28, 2022**
19-0374-01

25